

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ian H. Levin | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 6854 | **DATE** | 10/8/2002 |
| **CASE TITLE** | Scot L. Heimann vs. Roadway Express, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Enter memorandum opinion and order on defendant's motion for summary judgment and plaintiff's counter motion for summary judgment. Motion by defendant Roadway Express, Inc. for summary judgment [45-1] is hereby granted and the cause is dismissed with prejudice. Plaintiff's counter motion for summary judgment [55-1] is hereby denied. Plaintiff's motion to strike the 6/28/99 report and note from Dr. Fernandez and in the alternative, leave to file affidavit [51-1] is denied in part and granted in part.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 3 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | OCT 1 0 2002 | |
| ✓ | Notified counsel by telephone. | | date docketed | 68 |
| | Docketing to mail notices. | | *law* | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 10/9/2002 | |
| | | | date mailed notice | |
| SM | courtroom deputy's initials | | SM | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

| | | |
|---|---|---|
| SCOT L. HEIMANN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 99 C 6854 |
| v. | ) | |
| | ) | Magistrate Judge Ian H. Levin |
| ROADWAY EXPRESS, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Scot L. Heimann ("Plaintiff") seeks recovery in a Second Amended Complaint against Defendant Roadway Express, Inc. ("Roadway") for unlawful discriminatory employment practices in violation of the American with Disabilities Act of 1990, 42 U.S.C. §12101 *et seq.* and the Rehabilitation Act of 1973, 29 U.S.C. § 794. Before the Court are the parties cross-motions for summary judgment in the cause. For the reasons set forth below, the Court grants Defendant's Motion for Summary Judgment and denies Plaintiff's Counter Motion for Summary Judgment.

## BACKGROUND FACTS

Plaintiff was hired by Roadway in July 1997 as a truck driver[1] at its Chicago Heights terminal.[2] (Def.'s LR56.1(a)(3) St. ¶ 5.) At that time, Plaintiff was considered a "ten percenter"

---

[1] Plaintiff operated large tractor-trailer equipment, but was not required to load or unload freight. (Def.'s LR56.1(a)(3) St. ¶ 10.)

[2] Prior to his employment at Roadway, Plaintiff was employed as a police officer with the Chicago Police Department. (Def.'s LR56.1(a)(3) St. ¶ 7.) When he applied for the driver position at Roadway, Plaintiff was on a leave of absence from the Chicago Police Department due to an injury to his right hand. (*Id.*) As a result of his right hand injury, Plaintiff underwent surgery and received vocational rehabilitation services from the Illinois Department of



which meant that he was in the bottom ten percent of the seniority list and, pursuant to the collective bargaining agreement for his unit, he could be assigned to drive out of any of Roadway's Chicago area locations and would be assigned whatever truck was available at that location. (Def.'s LR56.1(a)(3) St. ¶ 11; Pl.'s LR56.1(b)(3)(A) Response to Def.'s LR56.1(a)(3) St. ¶ 11.)

In August 1998, Plaintiff injured his left hand in a work-related accident while working for Roadway, and underwent surgery with Dr. James Schlenker to repair his left middle finger tendon. (Def.'s LR56.1(a)(3) St. ¶ 12.) Dr. Schlenker released Plaintiff to return to work on September 17, 1998, but he was restricted from using his left hand. (*Id.* ¶ 13.) Plaintiff did not return to work immediately after his release was issued because he had been instructed by Dr. Schlenker not to return while he was taking narcotic medications. (*Id.* ¶ 14.) As a result, Plaintiff was unable to work until October 5, 1998, at which time, he returned to work with a temporary one-handed restriction that prevented him from driving. (*Id.* ¶ 15.)

The terms of the union collective bargaining agreement[3] governing Plaintiff's position

---

Rehabilitation Services. (Pl.'s Resp. to Def.'s LR56.1(a)(3) St. ¶¶ 7, 9.)

[3]The collective bargaining agreement states:

(1)     The Employer may establish a modified work program designed to provide temporary opportunity to those employees who are unable to perform their normal work assignments due to a disabling on-the-job injury.

* * * * * * *

(3)     At facilities where the Employer has a modified work program in place, temporary modified assignments shall be offered in seniority order to those regular full-time employees who are temporarily disabled due to a compensable worker's compensation injury and who have received a detailed medical release from the attending physician clearly setting forth the limitations under which the Employee may perform such modified assignments.

(continued...)

2

provides for temporary modified duty for those employees who had temporary work restrictions as a result of work-related injuries. (Def.'s LR56.1(a)(3) St. ¶¶ 16, 17.) Plaintiff understood that the temporary modified duty program applied to only those employees recovering from work-related injuries. (*Id.* at ¶ 20.) Therefore, as specified by the modified duty program, Plaintiff was assigned modified duty, working Monday through Friday, on the day shift, in a non-driving position at the Chicago Heights terminal.[4] (*Id.* at ¶ 15.)

On October 28, 1998, Plaintiff was released to full duty as a driver and he returned to working as a "ten percenter" out of Roadway's Chicago Heights terminal. (Def.'s LR56.1(a)(3) St. ¶ 22.) On November 6, 1998, Plaintiff saw Dr. Schlenker and told him that he was experiencing pain in his left hand that he believed was caused by exertion when driving manual steering trucks. (*Id.* ¶ 23.) As a result, Dr. Schlenker provided him with a temporary work restriction which precluded him from driving a truck (except for those with power steering) through November 30, 1998.[5] (*Id.*)

---

[3](...continued)

\* \* \* \* \* \* \*

> It is understood and agreed that those employees who, consistent with professional medical evaluations and opinion, may not be expected to receive an unrestricted medical release, or whose injury has been medically determined to be permanent and stationary, shall not be eligible to participate in a modified work program.

\* \* \* \* \* \* \*

> Disputes . . . shall be subject to the grievance procedure.
> (Def.'s LR56.1(a)(3) St. ¶ 17) (emphasis added).

[4]Pursuant to the terms of the collective bargaining agreement, while Plaintiff worked in the temporary modified duty program, he received eighty-five percent of his regular pay. (Def.'s LR56.1(a)(3) St. ¶ 18.)

[5]As of November 6, 1998, Plaintiff did not know whether his restrictions would be temporary or permanent, but he knew that his physician had only put the restriction in place until November 30, 1998. (Def.'s LR56.1(a)(3) St. ¶ 30.)

(continued...)

At that time, however, because Plaintiff was a ten percenter and a shuttle driver, he was not entitled to an assigned truck and power steering trucks were rarely available to him. (*Id.* ¶ 25.)

Plaintiff presented Dr. Schlenker's November 6, 1998 note to his supervisor, James Penny. (Def.'s LR56.1(a)(3) St. ¶ 26.) Based on the fact that the November 6, 1998 note contained only temporary work restrictions and because Plaintiff was expected to return to full duty, he remained subject to the terms of the modified duty program. (*Id.* ¶ 28.) However, instead of going back on modified duty, Plaintiff chose to continue driving manual steering trucks at the Chicago Heights terminal because he knew that he was about to be transferred to a different terminal. (*Id.* ¶ 29.) Shortly thereafter, as a result of a change in Plaintiff's seniority, he was no longer a "ten percenter" and he transferred to the Elk Grove Village terminal. (*Id.* ¶ 31.) At the Elk Grove Village terminal, power steering trucks were available to Plaintiff most of the time. (*Id.*)

On November 19, 1998, Dr. Schlenker released Plaintiff to full duty with a twenty-five pound lifting restriction; however, he did not restrict Plaintiff to only driving trucks with power steering. (Def.'s LR56.1(a)(3) St. ¶ 32.) Because Plaintiff was told that he could not drive with the restriction[6], he requested and obtained a full release from Dr. Schlenker on November 24, 1998. (*Id.* ¶¶ 33, 34, 35.) Plaintiff, subsequently, provided this full release to Roadway. (*Id.* ¶ 36.)

In December 1998, Plaintiff, again, became a "ten percenter" when a number of drivers were laid off. (Def.'s LR56.1(a)(3) St. ¶ 39.) Plaintiff returned to the Chicago Heights terminal and

---

[5](...continued)
In addition, this was the first time that Plaintiff requested any type of accommodation by Roadway. (*Id.* ¶ 24.)

[6]William Pittman, the manager of the Elk Grove Village terminal does not recall being presented with Dr. Schlenker's November 19, 1998 note. (Def.'s LR56.1(a)(3) St. ¶ 34.)

primarily drove manual steering trucks because that was the only type of truck available at that terminal. (*Id.*)

On December 24, 1998, Plaintiff returned to Dr. Schlenker and he was, again, given a work restriction requiring that he only drive trucks with power steering. (Def.'s LR56.1(a)(3) St. ¶ 39.) Plaintiff presented Dr. Schlenker's note to one of Roadway's supervisors and was told him that he would not be able to work with that restriction. (*Id.* ¶ 41.) Plaintiff was subsequently placed back in the modified duty program in a non-driving position working nights at the Chicago Heights terminal. (*Id.* ¶ 43.)

On February 10, 1999, pursuant to the collective bargaining agreement, Plaintiff was transferred to the Elk Grove Village terminal where he continued in the modified duty program working days instead of nights. (Def.'s LR56.1(a)(3) St. ¶ 45.) Because Plaintiff refused this modified duty assignment, Pittman sent Plaintiff two letters (dated February 12, 1999 and February 15, 1999) notifying him that if he failed to report as scheduled, he would be considered to have voluntarily resigned from his job. (*Id.* ¶ 47.) On February 16, 1999, Plaintiff sent Pittman a letter stating that he needed to work nights because his wife was pregnant and he needed to assist with the care of his two children. (*Id.* ¶ 48.) In his letter, Plaintiff requested that he be given a night shift position at either the Chicago Heights or the Elk Grove Village terminal and be allowed to drive a truck with power steering.[7] (*Id.*) Pursuant to a provision in the collective bargaining agreement,

---

[7]On February 19, 1999, Pittman wrote to Plaintiff notifying him that he needed to provide a current medical evaluation or he would be removed from the seniority list. (Def.'s LR56.1(a)(3) St. ¶ 51.) On February 22, 1999, Plaintiff and Pittman discussed Plaintiff's modified duty assignment and Plaintiff indicated that he needed to work nights, for personal, rather than for physical reasons related to his left hand impairment. (*Id.* ¶ 53.) Pittman, however, indicated that he did not have any modified duty assignments available during the night shift. (*Id.*)

however, Plaintiff's refusal to accept the modified duty assignment resulted in the suspension of his 'workers' compensation benefits. (*Id.* ¶ 58.)

Meanwhile, on February 11, 1999, Dr. John J. Fernandez conducted an independent medical examination of Plaintiff. (Def.'s LR56.1(a)(3) St. ¶ 63.) Dr. Fernandez diagnosed Plaintiff with bilateral carpal tunnel syndrome and recommended that Plaintiff have surgery on his left hand to improve his condition. (*Id.* ¶¶ 63, 64.) Dr. Fernandez gave Plaintiff a twenty pound lifting restriction occasionally and/or ten pound lifting restriction frequently.[8] (*Id.* ¶ 63.) One week later, Plaintiff was examined by his own physician, Dr. Schlenker, who also recommended that he have surgery. (*Id.* ¶ 66.) In Dr. Schlenker's February 18, 1999 report, he noted that Plaintiff had requested a power steering truck; however, he did not provide Plaintiff with any type of lifting restriction.[9] (*Id.* ¶¶ 55, 56.) Plaintiff, however, chose not to have surgery at that time, for personal reasons, because his wife was pregnant and needed his assistance. (*Id.* ¶ 67.)

In February 1999, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that Roadway had discriminated against him in violation of the ADA by failing to provide him with a modified duty night shift assignment (which he needed due to his wife's pregnancy) and by not providing him with a truck that had power steering (which lead to a shift change which was a hardship for him). (Def.'s LR56.1(a)(3) St. ¶¶

---

[8]On June 28, 1999, Dr. Fernandez revised Plaintiff's restrictions and indicated that he could lift, carry, push and pull fifty or more pounds for six to eight hours per day. (Def.'s LR56.1(a)(3) St. ¶ 65.) Plaintiff's only restriction was that he was required to drive a truck with power steering. (*Id.*) (*See* June 28, 1999 Physical Capacity Evaluation.)

[9]On March 25, 1999, Dr. Schlenker completed a Physical Capacity Evaluation form indicating that Plaintiff could lift, carry, push and pull fifty or more pounds for six to eight hours per day. (Def.'s LR56.1(a)(3) St. ¶ 56.) Dr. Schlenker's only restriction was that Plaintiff needed a power steering accommodation. (*Id.*)

68, 69, 72.) In an attempt to settle Plaintiff's EEOC Charge, Deborah Wears, a Roadway legal department employee, made arrangements for Plaintiff to drive a power steering truck at the Elk Grove Village terminal during the night shift. (*Id.* ¶ 73.) Both Wears and Pittman, the terminal manager, understood that Plaintiff's condition was temporary because they had not been notified by Plaintiff's physicians that it was a permanent condition. (*Id.* ¶¶ 75, 76.) Moreover, Wears was not aware of any medical records indicating that Plaintiff had any permanent restrictions. (*Id.* ¶ 76.) Furthermore, Wears did not arrange this accommodation based on any belief that Plaintiff was disabled. (*Id.* ¶ 75.) This accommodation became effective on March 1, 1999. (*Id.* ¶¶ 73, 79.)

On June 11, 1999, Plaintiff suffered another work-related accident which resulted in cuts to his head. (Def.'s LR56.1(a)(3) St. ¶ 80.) Plaintiff was unable to work for one week as a result of his injury. (*Id.*) Plaintiff, however, did not then (or ever) return to work at Roadway because he had begun treatment for reflex sympathetic dystrophy ("RSD"), a condition that is associated with pain, injury and trauma, related to his hands, at a pain clinic. (*Id.* ¶ 81.) Subsequently, however, Plaintiff's RSD resolved itself and he was given a clean bill of health by his physicians.[10]

In late October 1999, Plaintiff had carpal tunnel and ulnar tunnel release surgery performed on his left hand by Dr. Mass. (Def.'s LR56.1(a)(3) St. ¶ 85.) Plaintiff's surgery was successful and Dr. Mass reported that Plaintiff's symptomology had been relieved by the surgery and he had almost

---

[10]For instance, on August 5, 1999, Dr. Daniel Mass, who treated Plaintiff's hands, sent a letter to the Chicago Police Department stating: "I would have to state that Officer Heimann does not have an injury that affects a major life activity and, therefore, does not meet the definition of disability by the A.D.A." (Def.'s LR56.1(a)(3) St. ¶ 83; Mass Dep. 8, 76-77, *see* Aug. 5, 1999 ltr. from Dr. Mass to Richard Stevens, Chicago Police Department.) Moreover, Dr. Renata Variakojis, of the Pain Management Clinic, stated in a November 17, 1999 letter to Dr. Mass: "I do not believe that Scott [sic] Heimann currently has reflex sympathetic dystrophy." (*Id.* ¶ 84; Mass Dep. 76-77, *see* Nov. 18, 1999 ltr. from Dr. Variakojis to Dr. Mass.)

no pain. (*Id.* ¶ 86.) Dr. Mass further reported that Plaintiff had full range of motion and recommended that Plaintiff begin an exercise program to improve the function of his left hand. (*Id.* ¶ 87.) On November 8, 1999, Dr. Mass wrote a letter to Plaintiff's attorney indicating that Plaintiff was unable to work as a police officer because he could not shoot a gun with his right hand; consequently, he would not be able to defend himself. (*Id.* ¶ 90.) Dr. Mass stated that it was likely that Plaintiff could work in other occupations that did not require these types of activities. (*Id.*)

On January 21, 2000, Plaintiff had surgery on his right hand which was performed by Dr. Mass. (Def.'s LR56.1(a)(3) St. ¶ 91.) Dr. Mass considered the surgery to be successful and expected Plaintiff's right hand condition to improve as a result. (*Id.* ¶ 92.)

From November 1999 through August 2000 Plaintiff attended computer technical training and receive certificates of completion in three different courses. (Def.'s LR56.1(a)(3) St. ¶¶ 93, 94.)

From February 1999 to December 2000, Plaintiff applied for approximately two hundred jobs in a variety of industries. (Def.'s LR56.1(a)(3) St. ¶¶ 96, 97.) On December 11, 2000, Plaintiff sent a letter to Roadway requesting that he be permitted to return to his position as a driver with the accommodation of being assigned a truck with power steering. (*Id.* ¶ 99.) Roadway requested that Plaintiff provide documentation for his absence since June 1999, and requested additional information about his condition in order to consider his request. (*Id.* ¶ 101.) In the meantime, on December 21, 2000, Plaintiff accepted a job working for Certified Grocers Midwest as a full-time dispatcher with supervisory responsibilities.[11] (*Id.* ¶¶ 102, 107.)

---

[11]Plaintiff was also employed by ADC Telecommunications installing telecommunications equipment for three weeks in August 2000. (Def.'s LR56.1(a)(3) St. ¶ 104.) Plaintiff never requested any accommodation as a result of his physical condition and he left as a result of a work-related fall. (*Id.* ¶¶ 105, 106.)

As of April 16, 2001, the date of his deposition, Plaintiff was still working as a dispatcher at Certified Grocers Midwest. (Def.'s LR56.1(a)(3) St. ¶ 108.) Plaintiff's physical condition has not prevented him from performing his duties as a dispatcher and he has not requested any accommodation from Certified Grocers Midwest. (*Id.* ¶ 111.)

## LEGAL STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party had produced evidence to show that it is entitled to summary judgment, the party seeking to avoid such judgment must affirmatively demonstrate that a genuine issue of material fact remains for trial. *LINC v. Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 920 (7th Cir. 1997).

In deciding a motion for summary judgment, a court must "review the record in the light most favorable to the nonmoving party and to draw all reasonable inferences in that party's favor." *Vanasco v. National-Louis Univ.*, 137 F.3d 962, 964 (7th Cir. 1998). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Nevertheless, the nonmovant may not rest upon mere allegations, but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See also Linc*, 129 F.3d at 920. A genuine issue of material fact is not shown by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, 106 S.Ct. 2505 or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct.

1348, 89 L.Ed.2d 538 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## ANALYSIS

### I. PLAINTIFF'S MOTION TO STRIKE DR. FERNANDEZ'S JUNE 28, 1999 REPORT AND NOTE, OR IN THE ALTERNATIVE TO FILE AN AFFIDAVIT

Plaintiff moves to strike a June 28, 1999 report and note (hereinafter "reports") from Dr. Fernandez or, in the alternative, leave to file the affidavit of its expert, James Radke. (Pl.'s Mot. to Strike at 1.) For the following reasons, Plaintiff's Motion to Strike is denied, in part, and granted, in part.

Plaintiff initially argues that Dr. Fernandez's June 28, 1999 reports should be excluded because they were not properly produced during discovery. (Pl.'s Mot. to Strike at 1-2.) The Court, however, finds Plaintiff's assertion unmeritorious. Based on the record, the June 28, 1999, Physical Capacity Evaluation form completed by Dr. Fernandez was produced by Plaintiff almost two years ago in response to Defendant's First Request for Documents. (Brown Aff. ¶¶ 4-6; Brown Aff. Ex. 3.) Moreover, both the June 28, 1999 Physical Capacity Evaluation form and the June 28, 1999 Work Restriction Form were obtained during discovery via Defendant's appropriate subpoena to Dr. Fernandez for Plaintiff's medical records. (Brown Aff. ¶ 8; Brown Aff. Ex. 5). These records were obtained from Dr. Fernandez with Plaintiff's express consent after he signed an Authorization to Obtain Medical Records in this lawsuit. (*See id.*; *see also* Def. App. Ex. L.) Furthermore, Defendant sent Plaintiff a copy of the records received from Dr. Fernandez shortly after they were received from him. (Brown Aff. ¶ 9; *see also* Pl.'s App., Ex. G). Thus, based on the record, Dr. Fernandez's June

10

28, 1999 reports were properly produced to Plaintiff.

Plaintiff next asserts that Dr. Fernandez's June 28, 1999 reports should be barred because they are the result of an unauthorized *ex parte* communication between Dr. Fernandez and a representative of Roadway's workers' compensation insurance administrator, Gallagher & Bassett. (Pl.'s Mot. to Strike at 2-3.) Plaintiff specifically contends that Dr. Fernandez had a conversation with a representative of Roadway's workers' compensation insurer on June 28, 1999 concerning Dr. Fernandez's recommendations regarding Plaintiff's work-related left hand injury. (Pl.'s Dep. at 45-47; *see* Compl. ¶ 7.) Plaintiff alleges that this conversation between Dr. Fernandez and Roadway's workers' compensation insurer took place prior to his arrival for an appointment that day with Dr. Fernandez. (Pl.'s Dep. at 45-47.) Plaintiff claims, that as a result of the conversation, Dr. Fernandez refused to consider Plaintiff's evidence concerning his RSD condition. (Pl.'s Dep. at 45-46.) Plaintiff, therefore, contends that Dr. Fernandez changed his recommendations about Plaintiff's condition "out of the blue" as a result of this alleged conversation. (Pl.'s Mot. at 3.)

The Court finds that Plaintiff's assertion is wholly without support, in that, there is no evidence in the record to support the Plaintiff's gratuitous and speculative assertion that Dr. Fernandez had an unauthorized *ex parte* communication with a representative of Roadway's workers' compensation insurer on June 28, 1999. Because Plaintiff has failed to identify any evidence in the record that even hints at the fact that the alleged *ex parte* communication took place, or what the contents of the alleged communication might have been, Plaintiff's additional contention that the alleged communication violated Plaintiff's physician-patient privilege is clearly without

merit.[12]  (Pl.'s Mot. to Strike at 3.)

Therefore, the Court finds that Dr. Fernandez's June 28, 1999 reports constitute admissible evidence because they were properly obtained during discovery and are not the result of an unauthorized *ex parte* communication which violated Plaintiff's physician-patient privilege. As noted *supra* there is no evidence in the record to indicate that the alleged *ex parte* communication ever took place. Accordingly, the Court denies Plaintiff's Motion to Strike Dr. Fernandez's June 28, 1999 reports (i.e., Physical Capacity Evaluation form and Work Restriction Form); however, the Court grants Plaintiff leave to file Radke's Affidavit (providing supplemental information based on Dr. Fernandez's June 28, 1999 reports regarding the number of jobs Plaintiff would be precluded from performing if he were restricted to medium work).[13]

## II.    AMERICAN WITH DISABILITIES ACT CLAIM (COUNT I)

### ISSUE

Plaintiff claims that he was discriminated against by Roadway in violation of the ADA when

---

[12]The Court notes that, in any event, the cases cited by Plaintiff regarding the physician-patient privilege are distinguishable, in that those cases, unlike here, involved situations where a civil action had been already filed at the time of the communication in question.  Anyway, under Illinois law, the physician-patient privilege is waived where the patient consents to such waiver and where, as here, the patient puts his medical condition at issue in a legal proceeding.  735 ILCS 5/8-802(3) and (4); *Mercer v. Carle Found. Hosp.*, 633 N.E.2d 192, 192-93 (4th Dist. 1994)(holding that the employer's workers' compensation insurer was entitled to information concerning the employee's work-related injury).  Thus, by filing his claim for workers' compensation coverage for his injury against Roadway, as well as giving his express consent for the release of his medical records, Plaintiff authorized Roadway, and its workers' compensation insurer to receive any and all medical information concerning Plaintiff's injury.  Therefore, if the alleged *ex parte* communication occurred, Plaintiff waived his physician-patient privilege with respect to his injury and Roadway and its workers' compensation insurer were entitled to communicate with Plaintiff's physicians.

[13]Furthermore, the Court strikes Dr. Fernandez's Affidavit (filed by Plaintiff on July 9, 2002) which inappropriately excludes his June 28, 1999 reports.

12

Roadway failed to provide him with a truck with power steering during the period November 6, 1998 to March 1, 1999 after he sustained a work-related injury to his left hand. *See generally*, 2nd Am. Compl. ¶¶ 7, 16-18; Pl.'s 2nd Am. Resp.

## LEGAL STANDARDS

The ADA prohibits an employer from discriminating against a qualified individual with a disability. See 42 U.S.C. § 12112(a). Specifically, the ADA provides:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a).

The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. 42 U.S.C. § 12111(8).

In order to establish a prima facie case of disability discrimination in a failure to accommodate case, a plaintiff must show that: (1) he was or is disabled; (2) the defendant was aware of his disability; (3) he was otherwise qualified for his job; and (4) the disability caused the adverse employment action. *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1032 (7th Cir. 1999). "The determination as to whether an individual is a 'qualified individual with a disability' must be made as of the time of the employment decision." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996). "The plaintiff bears the burden of proof on this issue; he must be able to show that he is a 'qualified individual with a disability' in order to successfully prosecute an ADA claim." *Id.*

Under the ADA, "[a]n individual is 'disabled' if he has (1) a physical or mental impairment

which substantially limits one or more of the major life activities; (2) a record of such an 'impairment; or (3) if he is regarded as having such an impairment." *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1454 (7th Cir. 1995) (citing 29 U.S.C. § 706(8)(B); 29 C.F.R. § 1613.702(a); 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(g)). A medical diagnosis of an impairment is not sufficient; the extent of the limitation in terms of the plaintiff's own experience must be substantial. *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 690-91, 151 L.Ed.2d 615 (2002). "'Major" in the phrase 'major life activities' means important . . . 'Major life activities' thus refers to those activities that are of central importance to daily life." *Williams*, 122 S.Ct. at 691. According to the regulations promulgated under the ADA, "major life activities" include functions such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 480, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); 29 C.F.R. § 1630.2(i).

The regulations define "substantially limits" as "significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration which the average person in the general population can perform the same major life activity." *Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d 944, 951 (7th Cir. 2000) (citing 29 C.F.R. § 1630.2(j)(1)(ii). In determining whether an individual is substantially limited in a major life activity, the following factors should be considered: "the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment." *Williams*, 122 S.Ct. at 690 (citing 29 C.F.R. § 1630.2(j)(2)(i)-(iii)). *See also Baulos v. Roadway Express,* 139 F.3d 1147, 1151 n.3 (7th Cir. 1998) (same). An individual must show that he has a

permanent impairment that substantially limited his ability to perform a major life activity. *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1197 (7th Cir. 1997)("the temporarily disabled are not protected by the Americans with Disability Act"). Ultimately, the determination of whether an individual has a disability is not necessarily based on the person's impairment, but rather on the effect of that impairment on the life of the individual. *Sutton*, 527 U.S. at 483; *Williams*, 122 S.Ct. at 690-91. "An individualized assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from person to person." *Williams*, 122 S.Ct. at 692.

As an alternative to proving that he is actually disabled, a plaintiff can also satisfy this element of his *prima facie* case by proving that his employer regarded him as disabled. *Skorup v. Modern Door Corp.*, 153 F.3d 512, 515 (7th Cir. 1998). However, [i]t is not enough for [the plaintiff] to show that [the defendant] was aware of [his] impairment; instead [the plaintiff] must show that [the defendant] knew of the impairment and believed that [he] was substantially limited because of it." *Id. See also Roth*, 57 F.3d at 1457 (the employer must regard the plaintiff as having a substantially limiting impairment in order to trigger the protection of the ADA).

### A. COLLATERAL ESTOPPEL DOES NOT BAR THIS COURT'S JURISDICTION IN DETERMINING IF PLAINTIFF WAS DISABLED WITHIN THE MEANING OF THE ADA.

Plaintiff initially argues that a July 2001 determination by the Illinois Industrial Commission (hereinafter "Commission") regarding Plaintiff's left hand condition establishes that he is permanently disabled and, therefore, Roadway is collaterally estopped from relitigating this issue. (Pl.'s 2nd Am. Resp. at 16, 23-25.) Specifically, Plaintiff asserts that the Commission (in regard to a workers' compensation claim) found that he suffered a thirty percent complete and permanent loss

of his left hand as a result of the August 26, 1998 injury. (Pl.'s Reply at 1-2.)

Plaintiff cites *Radaszewski v. Metro. Water Reclamation Dist. of Greater Chicago*, No. 96 C 8320, 1998 WL 386358, at *3 (N.D. Ill. July 6, 1998) as support for his proposition. In *Radaszewski*, the court found that issue preclusion applies where a previous judgment is conclusive. *See id.* Specifically, a prior judgment is conclusive if the party seeking the benefit of collateral estoppel demonstrates that:

> (1) the issue presented in the current action is identical to the one decided in prior adjudication; (2) there was a final judgment on the merits in the prior adjudication; and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication. *Id.*

Plaintiff claims that, as established by *Radaszewski*, Roadway is precluded from relitigating the issue of disability because this same issue was adjudicated by the Commission in July 2001.

Regarding the first element of the *Radaszewski* test, the Court finds that Plaintiff has presented no evidence demonstrating that the Commission's determination regarding his medical condition was done utilizing the same definition of disability as that used by courts when determining disability within the meaning of the ADA. Specifically, Plaintiff has failed to establish that the Commission determined that he had a physical or mental impairment which substantially limited one or more of the major life activities. *See e.g., Roth,* 57 F.3d at 1454. Moreover, Plaintiff cannot show that the Commission determined that his condition substantially limited a major life activity, as established in *Williams,* 122 S.Ct. at 690.

The Court, therefore, finds Plaintiff's collateral estoppel argument without merit because he has failed to meet the first element of the *Radaszewski* test for issue preclusion.

## B.   THE FACTUAL RECORD SHOWS THAT PLAINTIFF DID NOT HAVE A PERMANENT CONDITION (AND WAS NOT DISABLED UNDER THE

Plaintiff alleges that Roadway discriminated against him from November 6, 1998 to March 1, 1999 when it refused to accommodate him by not providing him a truck with power steering even though Roadway knew that he had a permanent disability. (Pl.'s 2nd Am. Resp. at 10.)

However, the undisputed evidence shows that between November 6, 1998 and March 1, 1999, Plaintiff's condition was not permanent, nor was it considered to by permanent by Roadway. As established by the record, the undisputed evidence in the case regarding the first element of Plaintiff's ADA claim is as follows:

- On November 6, 1998, Plaintiff presented a note from his physician, Dr. Schlenker, which stated that he had a work restriction (power steering trucks only) that lasted only until November 30, 1998. (Def.'s LR56.1(a)(3) St. ¶ 23.) As of November 6, 1998, Plaintiff did not know whether his restrictions would be temporary or permanent, but he knew that his physician had put the restrictions in place until November 30, 1998. (*Id.* ¶ 30.)

- The next physician's note, also from Dr. Schlenker, dated November 19, 1998, gave Plaintiff a release to full duty with a twenty-five pound lifting restriction. (Def.'s LR56.1(a)(3) St. ¶ 32.) Dr. Schlenker did not mention that Plaintiff needed to drive a power steering truck. (*Id.*) On November 24, 1998, another note was submitted from Dr. Schlenker releasing Plaintiff to full duty with no restrictions. (*Id.* ¶ 35.)

- On or about December 24, 1998, Dr. Schlenker gave Plaintiff another note restricting him to only driving trucks with power steering. (Def.'s LR56.1(a)(3) St. ¶¶ 40-41.) Dr. Schlenker did not indicate that this restriction was permanent. (*Id.*) As a result of this restriction, Plaintiff was placed in Roadway's modified duty program. (*Id.* ¶¶ 16-17, 43.) Plaintiff understood that the modified duty program only applied to employees recovering from temporary work-related injuries. Plaintiff did not dispute or grieve the fact that he had been placed on modified duty based upon this restriction. (*Id.* ¶¶ 44, 59.)

- On February 11, 1999, Dr. Fernandez performed an independent medical examination of Plaintiff. (Def.'s LR56.1(a)(3) St. ¶ 63.) Dr. Fernandez's only restriction was a twenty pound lifting restriction occasionally and/or ten pound lifting restriction frequently and/or negligible force constantly to lift, carry, push, pull or move objects. (*Id.* ¶¶ 63-64.) He did not specify a power steering restriction at that time. (*Id.*) Dr. Fernandez stated that this lifting restriction should be carried out indefinitely until Plaintiff's symptoms

improve or he undergoes further treatment. Moreover, he recommended that Plaintiff have surgery to improve the function of his left hand. (*Id.* ¶ 64.) Dr. Fernandez's recommendation states:

> I would recommend a left open carpal tunnel release to be performed by a qualified hand surgeon. [Plaintiff] should be allowed approximately two weeks off of work following this, followed by a light duty position for four weeks. After this time, [Plaintiff] can return to a full-duty position in six to eight weeks. (Def.'s LR56.1(a)(3) St. ¶¶ 63-64; Pl.'s Dep., Ex. 26 at 5.)

Thus, Plaintiff's condition was clearly temporary as of February 11, 1999.

- On February 18, 1999, Plaintiff saw Dr. Schlenker who also recommended that Plaintiff have surgery. (Def.'s LR56.1(a)(3) St. ¶ 66.) Dr. Schlenker recommended, in the meantime, that Plaintiff drive only power steering trucks because he believed that driving a truck without power steering could aggravate Plaintiff's condition. (Def.'s LR56.1(a)(3) St. ¶ 66; Pl.'s Dep., Ex. 30 at 2.) Dr. Schlenker qualified this remark by stating that he would like to obtain further test results. (*Id.*) Thus, based on Dr. Schlenker's report, Plaintiff's condition had not been determined to be permanent.

In addition, shortly after March 1, 1999, the date on which Plaintiff states that he was accommodated by Roadway, two Physical Capacity Evaluations were completed by Drs. Schlenker and Fernandez concerning Plaintiff's condition. Dr. Schlenker's March 25, 1999 report indicated that Plaintiff could lift, carry push and pull fifty or more pounds for six to eight hours per day, and that his only restriction was power steering. (Def.'s LR56.1(a)(3) St. ¶ 56.) The report completed by Dr. Fernandez, on June 28, 1999, had the same findings. (*Id.* ¶ 65.)

The Court further notes that Plaintiff was told in February 1999 that he needed to have surgery to improve his left hand, but chose not to do so at that time for personal reasons. (Def.'s LR56.1(a)(3) St. ¶ 67; *see also* Pl.'s 2nd Am. Resp. at 16.) In October 1999, almost a year after the alleged discrimination, Plaintiff had the recommended surgery which was performed by Dr. Mass. (Def.'s LR56.1(a)(3) St. ¶ 85; *see also* Pl.'s 2nd Am. Resp. at 16.)

As demonstrated by the record, Plaintiff presented Roadway management with a series of

physicians' notes which alternated between releasing him to full duty with no restrictions, and requiring him to only drive trucks with power steering.[14] (Def.'s LR56.1(a)(3) St. ¶¶ 22-23, 35, 40.) Thus, from October 1998 through February 1999, when Plaintiff worked, he either performed modified duty because he had a temporary work restriction, or he drove because he had no restriction. (*Id.* ¶¶ 13, 15, 22-23, 35, 40-43.) The only reason he did not perform temporary modified duty, during February 1999, was because of his personal preference to work nights.[15] (*Id.* ¶¶ 53, 57-58.)

During the relevant time period (i.e., November 6, 1998 through March 1, 1999), no one, including Plaintiff's physicians knew that his condition was anything other than temporary. In fact, based on the physician's notes, it was certainly reasonable for Roadway's management to consider Plaintiff's condition as being temporary. Even Plaintiff stated, at that time, that he did not know whether his condition was temporary or permanent. (Def.'s LR56.1(a)(3) St. ¶ 21.) Plaintiff also testified that his symptoms subsided when he drove a truck with power steering. (*Id.* ¶ 37.) *See e.g., Vande Zande v. State of Wisconsin Dep't of Admin.,* 44 F.3d 538, 544 (7th Cir. 1995)("Intermittent, episodic impairments are not disabilities . . .") Therefore, as demonstrated by the medical evidence, Plaintiff cannot establish that he had a permanent impairment; consequently, he is not subject to the protections of the ADA. *See e.g., Matthews,* 128 F.3d at 1197 ("the temporarily disabled are not protected by the Americans with Disability Act").

Even assuming *arguendo* that Plaintiff's alleged disability can be viewed as permanent, for

---

[14]In addition, Plaintiff acknowledged that the only physician's note which restricted Plaintiff's lifting was not presented to Roadway management. (Def.'s LR56.1(a)(3) St. ¶ 35.)

[15]Plaintiff stated that he needed to work nights due to his wife's pregnancy so that he could assist with the care of his two children. (Def.'s LR56.1(a)(3) St. ¶ 48.)

the reasons set forth below, the Court finds that he cannot show that his impairment or condition 'substantially limited one or more of the major life activities. *Williams*, 122 S.Ct. at 690.

### C. PLAINTIFF IS NOT DISABLED FROM ANY IDENTIFIED MAJOR LIFE ACTIVITY.

Plaintiff alleges that he is substantially limited in the major life activities of "working in different occupations, performing manual tasks, performing tasks with his hands, lifting, concentration, and fine manipulation." (2nd Am. Compl. ¶ 38.)

### 1. Major Life Activity of Working

Plaintiff first argues that he is disabled under the ADA because he is substantially limited in the major life activity of working because he had difficulty in finding employment after working at Roadway. (Pl.'s 2nd Am. Resp. at 10-11.) Plaintiff specifically asserts that his restrictions substantially limited the number and class of jobs available to him. (*Id.* at 11.)

"It is now well-established that an inability to perform a particular job for a particular employer is not sufficient to establish a substantial limitation on the ability to work; rather, the impairment must substantially limit employment generally." *Baulos*, 139 F.3d at 1151. "'Substantially limits' when referring to the major life activity of working [means] 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.'" *Sutton*, 527 U.S. at 491 (*citing* 29 C.F.R. § 1630.2(j)(3)(i)). As such "[the plaintiff] has the burden of presenting evidence to demonstrate that his impairment limited his ability to perform an entire class of jobs." *Contreras v. Suncast Corp.*, 237 F.3d 756, 762 (7th Cir. 2001), *cert.*

20

*denied* 122 S.Ct. 62 (2001). Moreover, to show that a plaintiff is substantially limited in working, expert testimony may be offered identifying the reduction in job opportunities that result from a plaintiff's disability. *See e.g., Dalton v. Subaru -Isuzu Automotive, Inc.,* 141 F.3d 667, 675 (7th Cir. 1998).

In support of Plaintiff's assertion that he is substantially limited in the major life activity of work, he offers the testimony of James Radke, a vocational rehabilitation expert.[16] (Pl.'s 2nd Am. Resp. at 11.)

The Court finds Plaintiff's assertion that he was substantially limited in the major life of activity of working unavailing. First, as an initial matter, Radke's opinion is flawed because he initially based his findings on Dr. Fernandez's February 11, 1999 report which actually indicated that Plaintiff's condition was only temporary because surgery would allow him to return to full duty. (Def.'s LR56.1(a)(3) St. ¶¶ 64, 126; Pl's Dep., Ex. 26 at 5.) Additionally, Radke stated that the main thing he considered in his opinion was that Plaintiff had a "permanent" lifting restriction as identified in Dr. Fernandez's February 11, 1999 report. (Def.'s LR56.1(a)(3) St. ¶126.) However, apart from the fact that Dr. Fernandez's report prognosis was full recovery after surgery, Radke acknowledged that he had not considered that Dr. Fernandez subsequently removed the lifting restriction on June 28, 1999. (*Id.* ¶127.) Further, Dr. Schlenker also indicated on March 25, 1999 that Plaintiff no

---

[16]Roadway argues that Plaintiff has denied that he is offering Radke as an expert witness (Def.'s LR56.1(a)(3) St. ¶ 125) and moreover, Plaintiff has presented no foundation that Radke's reports are based on his personal knowledge. (Def.'s Reply at 7-8.) Therefore, Roadway asserts that the reports should be disregarded in their entirety. (*Id.* at 9.) *See e.g., Russell v. Acme-Evans Co.,* 51 F.3d 64, 68 (7th Cir. 1995) ("a witness (other than an expert witness) is not allowed to testify to matters outside his personal knowledge . . . ") The Court, however, finds that Radke is being offered as an expert witness and consequently, his reports are admissible. As noted, *supra,* Plaintiff was given leave to file Radke's Affidavit.

longer had this lifting restriction. (*Id.* ¶ 56.)

The Court next notes that the case law cited by Plaintiff is distinguishable, in that, Plaintiff's abilities contrast sharply with those plaintiffs in cases he cites. For example, in *Dalton,* 141 F.3d at 676, most of the plaintiffs, who were assembly line workers, were precluded from sixty-nine to eight-nine percent of the unskilled jobs for which they were qualified. In *England v. ENBI Indiana, Inc.,* 102 F.Supp.2d 1002, 1011 (S.D. Ind. 2000), an assembly line worker was faced with a ninety-six (96.2) percent reduction in the number of jobs available to her. In contrast here, even Radke's flawed report of November, 2001, found that Plaintiff could perform approximately seventy-five percent of the skilled jobs for which he was qualified, even without Radke's admitted omission to consider Plaintiff's management skills used by Plaintiff in his current position. (Def.'s LR56.1(a)(3) St. ¶ 109; *see also* Pl.'s 2nd Am. Resp. at 12; Radke Aff. ¶¶ 5, 6.)[17]

Further, and in any event, Plaintiff's own deposition testimony demonstrates that he is not substantially limited in the major life activity of working. Plaintiff testified that between February 1999 and December 2000 he applied for approximately two hundred jobs in a variety of industries, which he believed he was physically qualified to perform.[18] (Def.'s LR56.1(a)(3) St. ¶¶ 96-98.) For instance, Plaintiff applied for the following positions: driver, investigator, claims investigator, safety manager, dispatcher, recruiter, management trainee, job coach, security supervisor, account manager, spotter, telecommunications installer, financial planner, credit manager trainee, criminal justice

---

[17]Specifically, Radke's own later June, 2002 affidavit states that Plaintiff would be unable to perform only 3.2 percent of skilled and semi-skilled jobs, and approximately twenty-six percent of unskilled jobs in the relevant region. (Radke Aff. ¶¶ 5, 6.)

[18]Plaintiff's resume detailed his experience in the criminal justice, transportation, and computer fields as well as his skills in the areas of leadership, communications, management, problem solving, customer service, mediation, conflict resolution, report writing, and sales. (Def.'s LR56.1(a)(3) St. ¶ 96.)

specialist, to name only a few. (*Id.* ¶ 97.)

As a result of his job search, Plaintiff was successful in obtaining employment. In August 2000, Plaintiff was employed by ADC Telephone Communications installing telecommunications equipment. (Def.'s LR56.1(a)(3) St. ¶ 104.) During the time Plaintiff was employed with ADC Telephone Communications, he never requested any type of accommodation as a result of his physical condition.[19] (*Id.* ¶ 105.) In December 2000, Plaintiff received three job offers and accepted an offer from Certified Grocers Midwest as a dispatcher with supervisory responsibilities.[20] (*Id.* ¶¶ 107, 109.) Plaintiff did not request any type of accommodation from Certified Grocers Midwest and his condition did not prevent him from performing his duties as dispatcher. (*Id.* ¶ 111.)

The Court, thus, finds that the fact that Plaintiff is working is, in and of itself, sufficient evidence to defeat his claim that he is substantially limited in the major life activity of working. *Puoci v. City of Chicago,* 81 F.Supp.2d 893, 897 n.2 (N.D. Ill. 2000)("Where a plaintiff claims that he is substantially limited in the major life activity of working; however, admitting to being able to work does, in fact, invalidate the argument"); *Sinkler v. Midwest Prop. Mgmt. Ltd. Pshp.*, 209 F.3d 678, 685-86 (7th Cir. 2000)[21] (the plaintiff's ability to procure new employment is evidence that a

---

[19]Plaintiff left his employment at ADC Telecommunications because of a work-related fall. (Def.'s LR56.1(a)(3) St. ¶ 106.)

[20]As of the date of Plaintiff's deposition, April 16, 2001, he was still employed in this position. (Def.'s LR56.1(a)(3) St. ¶ 108.)

[21]Plaintiff argues that because his job as a dispatcher is different than his job as a driver, he is disabled in the major life activity of working. (Pl.'s 2nd Am Resp. at 14; Pl.'s Reply at 9.) He attempts, unsuccessfully, to distinguish Roadway's cited cases on this point by noting that, in these cases, the plaintiffs were able to do their former jobs. Plaintiff notes that, for example, the plaintiff in *Sinkler,* 209 F.3d at 686, was found not substantially limited in the major life activity of working because she was able to return to a sales job as long as the job did not require her to drive outside her home town. Similarly, herein, Plaintiff acknowledges that he would be able to do his former driving job if he had power steering. (2nd Am. Compl. ¶ 39.) In fact, Plaintiff admits that he was able to perform his driving job at Roadway after his injury when he was assigned to the Elk Grove Village terminal where he routinely drove trucks with power

(continued...)

23

broad range of jobs was open to her); *Moore*, 221 F.3d at 953 (the plaintiff's ability to find a new job is evidence that he was not significantly limited in his ability to work).

The Court, therefore, finds Plaintiff's assertion that he was substantially limited in the major life activity of working cannot prevail because he successfully sought and obtained employment at Certified Grocers Midwest as a dispatcher. *See e.g., Puoci,* 81 F.Supp.2d at 897 n.2. Moreover, as demonstrated by Radke's reports, deposition testimony and affidavit, there is no evidence in the record establishing that Plaintiff is significantly restricted in his ability to perform either a class of jobs or a broad range of jobs when compared to the average person having comparable training, skills and abilities. Rather, based on Radke's statistical analysis, Plaintiff is only precluded from about three (3.2) percent of the skilled jobs and twenty-six percent of the unskilled jobs in the nine county northeastern Illinois region. Therefore, since Plaintiff is physically able to work in a broad range of jobs and, in fact, has been successful in finding employment, he is unable to meet his burden of showing that he is precluded from employment generally, and consequently, he cannot sustain his burden that he is substantially limited in the major life activity of working. *See e.g., Baulos,* 139 F.3d at 1151.

## 2. Major Life Activity of Performing Manual Tasks[22]

Plaintiff argues that as result of his hand condition, which was diagnosed as carpal tunnel syndrome, he is substantially limited in the major life activity of performing manual tasks. (2nd Am.

---

[21](...continued)
steering. (Def.'s LR56.1(a)(3) St. ¶¶ 29, 31, 73, 75, 79.) Like the plaintiff in *Sinkler,* Plaintiff's own admissions establish that he is not substantially limited in the major life activity of working.

[22]"Performing tasks with his hands" and "fine manipulation" are included as part of the performing manual tasks analysis. (2nd Am. Compl. ¶ 38.)

Compl. ¶ 38; Pl.'s 2nd Am. Compl. at 14-15; Pl.'s Reply at 9-10.)

As the Supreme court recently noted, symptoms of carpal tunnel syndrome vary widely from person to person:

> While cases of severe carpal tunnel syndrome are characterized by muscle atrophy and extreme sensory deficits, mild cases generally do not have either of these effects and create only intermittent symptoms of numbness and tingling.

*Williams*, 122 S.Ct. at 692. For example, one quarter of the carpal tunnel cases resolve within one month without surgical intervention. *Id.* In only twenty-two percent of the cases do the symptoms last for eight years or longer. *Id.* Plaintiff must, therefore, show that his symptoms were sufficiently severe to substantially limit his ability to perform manual tasks.[23]

The Supreme Court has clarified that, "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Williams*, 122 S.Ct. at 691. "[T]he central inquiry must be whether the [individual] is unable to perform the variety of tasks central to most people's daily lives, not whether the [individual] is unable to perform the tasks associated with [his] specific job." *Id.* at 693. "Household chores, bathing, and brushing one's teeth are among the types of manual tasks [that are] of central importance to people's daily lives . . ." *Id.* Moreover, as stated *supra*, "[t]he determination of whether an individual is a 'qualified individual with a disability' must be made as of the time of the employment decision." *Bombard*, 92 F.3d at 563.

---

[23] A number of courts have considered the question of whether carpal tunnel syndrome constitutes a disability and have found that it does not. *See e.g., Martini v. A. Finkl & Sons Co.,* No. 96 C 0756, 1996 WL 667816, at * 9 (N.D. Ill. Nov. 15, 1996); *Gelabert-Ladenheim v. American Airlines,* ¶252 F.3d 54, 63 (1st Cir. 2001); *Gutridge v. Clure,* 153 F.3d 898, 901 (8th Cir. 1998); *Ribera v. Pro Communications, Inc.,* No. EP-99-CA-172-DB, 2000 WL 33348724, *4-5 (W.D. Tex. Nov. 28, 2000).

The Court finds Plaintiff's contention that he is substantially limited in the major life activity of performing manual tasks unavailing. First, the Court notes that Plaintiff specifically testified that it was only when he drove a manual steering truck that his carpal tunnel syndrome was exacerbated and his symptoms subsided when he drove a truck with power steering; thus, as discussed *supra* his condition was intermittent and not permanent. (Def.'s LR56.1(a)(3) St. ¶¶ 36-37.) Next, there is no evidence in the record that from November 6, 1998 to March 1, 1999, the period in question herein, Plaintiff was precluded from performing manual tasks. Rather, in his briefs, Plaintiff delineates those manual tasks that as of April 16, 2001 (the date of his deposition) he could not perform. Moreover, while Plaintiff tries to imply that he currently is not capable of performing all sorts of activities, this inference is not supported by the record.

Plaintiff testified, for example, that his condition does not prevent him from walking, seeing, hearing, speaking, breathing, learning, standing, sitting, or caring for his daily hygiene and personal care. (Def.'s LR56.1(a)(3) St. ¶ 113.) Also, the fact that Plaintiff was capable of performing the manual tasks associated with the jobs he applied for demonstrates that he was not significantly restricted as to the condition, manner or duration under which he could perform manual tasks as compared to that of an average person in the general population. *See e.g., Moore,* 221 F.3d at 951. Moreover, Dr. Mass, Plaintiff's carpal tunnel surgeon, testified that Plaintiff could still do many manual activities, but that he may have to change the way he does them. In fact, Plaintiff testified that he has changed the way he does various activities and does fewer of some activities, or engages in them for shorter periods of time. (*Id.* ¶¶ 117-118.) Doing activities differently, however, does not support a conclusion that Plaintiff is disabled. *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 564-65, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999)(holding that a mere difference in performing manual

26

tasks is not a substantial limitation).

Therefore, the Court finds that the record evidence fails to establish that Plaintiff is substantially limited in the major life activity of performing manual tasks during the relevant time frame (or even currently), such that, he has an impairment that prevents or severely restricts him from "doing activities that are of central importance to most people's daily lives."[24] *Williams*, 122 S.Ct. at 691.

### 3. Major Life Activity of Lifting

Plaintiff asserts that he is substantially limited in the major life activity of lifting. (Pl.'s 2nd Am. Resp. at 17-18; Pl.'s Reply at 11.)

In preface, the ADA regulations specify that lifting is a major life activity. *Thompson v. Archer Daniels Midland Co.*, 174 F.Supp.2d 833, 839 (C.D. Ill. 2001). The Seventh Circuit, however, recently held that as a matter of law a "twenty-five pound lifting limitation - particularly when compared to an average person's abilities - does not constitute a significant restriction on one's ability to lift, work, or perform any other major life activity." *Id.* at 840 (*citing Contreras*, 237 F.3d at 763, *quoting Williams v. Channel Master Satellite Sys.*, 101 F.3d 346, 349 (4th Cir. 1996) *cert. denied*, 520 U.S. 1240 (1997); *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1319 (8th Cir. 1996) (twenty-five pound lifting restriction did not significantly restrict major life activities). Moreover, as noted *supra* the limitation on the major life activity of lifting is to be determined as of

---

[24]Plaintiff has presented no evidence that his inability to shoot a gun, defend himself in a fight and use a vibratory tool with his right hand constitute those activities that are "of central importance to most people's daily lives." *Williams*, 122 S.Ct. at 691.

Also, Plaintiff's claims that he experiences some pain, numbness and tingling are unavailing. (*See* Pl.'s 2nd Am. Resp. at 15.) As the Supreme Court noted, these are symptoms of mild carpal tunnel syndrome. *Williams*, 122 S.Ct. at 692. Too, as the Seventh Circuit recently stated, "discomfort and disability are not synonyms." *Szmaj v. Am. Telephone & Telegraph Co.*, 291 F.3d 955, 956 (7th Cir. 2002).

the time of the alleged discrimination. *Bombard*, 92 F.3d at 563.

The Court finds Plaintiff's assertion that he is substantially limited in the major life activity of lifting unpersuasive. First, as discussed *supra*, there was no indication that during the relevant period that his lifting restriction was permanent. Next, on November 19, 1998, Plaintiff was given a lifting restriction of twenty-five pounds by his physician, Dr. Schlenker. (Def.'s LR56.1(a)(3) St. ¶¶ 23-24, 32, 79.) However, once Plaintiff realized that Roadway would not allow him to drive with this lifting restriction, he requested that Dr. Schlenker remove it. (*Id.* ¶¶ 33, 35.) Subsequently, on November 24, 1998, Dr. Schlenker gave Plaintiff a full release with no restrictions. (*Id.* ¶ 35.) Furthermore, on February 18, 1999, Dr. Schlenker indicated that there was no need for a lifting restriction. (*Id.* ¶ 55.)

The evidence further demonstrates that even though Dr. Fernandez noted a twenty pound lifting restriction in his February 11, 1999 report; he completed a Physical Capacity Evaluation on June 28, 1999 which indicated that Plaintiff could lift, carry, push and pull fifty pounds of more for six to eight hours per day. (Def.'s LR56.1(a)(3) St. ¶¶ 63, 65.) On March 25, 1999, Dr. Schlenker also submitted a Physical Capacity Evaluation form which indicated that Plaintiff could lift, carry, push and pull fifty pounds or more for six to eight hours a day. (*Id.* ¶ 56.) The Court notes that Plaintiff had the surgery both these physicians recommended since the subject lifting restrictions were in place.[25] (*Id.* ¶ 85.)

---

[25]Plaintiff's reliance upon certain cases to support his claim is, respectfully, misplaced. For example, in *Contreras*, 237 F.3d at 763, *cert. denied*, 122 S.Ct. 860 (2002), the plaintiff was unable to engage in strenuous work and unable to drive a forklift for more than four hours per day. In *Wooten v. Farmland Foods*, 58 F.3d 382, 384 (8th Cir. 1995), the plaintiff had restrictions on working with meat products and working in a cold environment, in addition to his lifting restriction. In *Ray v. Glidden Co.*, 85 F.3d 227, 229 (5th Cir. 1996), the plaintiff could not reach, in addition to his lifting restriction. Even so, and notably, the courts in these cases still found

(continued...)

In addition, even Plaintiff's more recent lifting restriction, provided by Dr. Mass on December 7, 2000, only states that he cannot do repetitive lifting. (Def.'s LR56.1(a)(3) St. ¶ 99.) This does not significantly limit Plaintiff in his ability to lift when compared to the condition, manner or duration under which the average person in the general population can lift. *See e.g., Moore,* 221 F. 3d at 950.

In view of the foregoing, Plaintiff has not establish that he was substantially limited in the major life activity of lifting.

### 4.    Major Life Activity of Concentration

In his Second Amended Complaint, Plaintiff alleges that he is substantially limited in the major life activity of concentrating. (2nd Am. Compl. ¶ 38.)

The Seventh Circuit recently considered whether concentrating is a major life activity and treated it as an activity that feeds into the major life activities of learning and working. *Emerson v. Northern States Power Co.,* 256 F.3d 506, 511 (7th Cir. 2001). As discussed *supra,* Plaintiff cannot establish that he is substantially limited in the major life activity of working. Furthermore, the majority, if not all, of the jobs Plaintiff applied for (and acknowledged he was physically capable of performing) require the ability to concentrate. (Def.'s LR56.1(a)(3) St. ¶¶ 97-98.)

Next, Plaintiff cannot establish that he is substantially limited in the major life activity of learning. In fact, Plaintiff attended training and successfully completed three computer courses. (Def.'s LR56.1(a)(3) St. ¶¶ 93-94.) Thus, the Court finds that there is no evidence in the record to support Plaintiff's allegation that he was substantially limited in the life activity of concentrating.

### D.    ROADWAY NEVER REGARDED PLAINTIFF AS DISABLED.

---

[25](...continued)
that the plaintiffs were not disabled.

Plaintiff asserts that Roadway knew that he had a history of a disability and, moreover, Roadway regarded him as having a disability. (Pl.'s 2nd Am. Resp. at 18-20; Pl.'s Reply at 11-12.)

As stated *supra,* an alternative to proving that he is actually disabled, Plaintiff can also satisfy the "disabled" element of his *prima facie* case by proving that his employer regarded him as disabled. *Skorup,* 153 F.3d at 515. Plaintiff must show that, not only did Roadway know of his impairment, but that Roadway believed or perceived him to be substantially limited as a result of the impairment. *Id.*; *Moore,* 221 F.3d at 954.

Initially, the Plaintiff alleges that Roadway regarded him as disabled because of his previous injury to his right hand. The Court finds, however, that there is no evidence that would even remotely establish that any decision maker at Roadway was aware of the fact that Plaintiff had sustained an injury to his right hand prior to working at Roadway.[26] For instance, Penney, Plaintiff's supervisor at the Chicago Heights terminal, does not recall ever knowing anything about Plaintiff's right hand impairment. (Def.'s LR56.1(a)(3) St. ¶ 9.) Pittman, the manager of the Elk Grove Village terminal, also did not know about Plaintiff's prior right hand injury. (*Id.* ¶ 62.) Moreover, Plaintiff did not identify himself as disabled during the interview process. (*Id.* ¶ 9.) Further, Plaintiff admits that, although he discussed his right hand injury with, Dr. Elliott, the physician who performed his physical examination required by the Department of Transportation, he told Dr. Elliott that he had no problem driving; consequently, Dr. Elliott did not give him any type of restriction. (*Id.* ¶ 8.)

---

[26]Plaintiff points to a Department of Rehabilitation Services ("DORS") report as evidence that he was disabled prior to working for Roadway. (Pl.'s 2nd Am. Resp. at 2.) However, Plaintiff does not attempt to show how that this finding is identical to the issue being decided by this Court. *See e.g., Radaszewski,* 1998 WL 386358, at *3. The Court notes that the DORS made a determination about Plaintiff's right hand injury; however, the issue, herein, concerns Plaintiff's left hand. Furthermore, Plaintiff admits that his right hand condition did not require any accommodation in order for him to do his driving job at Roadway. (Def.'s LR56.1(a)(3) St. ¶ 8.)

Plaintiff also performed all the functions of his job, including driving trucks with manual steering, from the time he was hired in July 1997 until the time that he injured his left hand in August 1998. (*Id.* ¶¶ 5, 8, 11-12.) Therefore, Plaintiff has presented no evidence to demonstrate that Roadway was aware of his right hand impairment and perceived Plaintiff as being substantially limited in a major life activity because of it.

Next, the Court notes that Plaintiff cannot show that Roadway discriminated against him in regard to his left hand impairment because it either perceived him as being disabled or believed that he was disabled. As discussed *supra* (Sec. II, pt. B), a review of the medical information that Roadway's management had regarding Plaintiff's left hand injury demonstrates that it had no reason to believe that his condition was anything but temporary. Moreover, there is no evidence that Roadway's decision makers ever knew about Plaintiff's carpal tunnel diagnosis. Consequently, Roadway had no knowledge that Plaintiff's condition was anything other than temporary and, as a result, Plaintiff was placed in the temporary modified duty program, which was specifically for individuals who were expected to fully recover from their work related injuries. (Def.'s LR56.1(a)(3) St. ¶ 16.) In addition, the fact that Roadway would not allow Plaintiff to work as a driver with a restriction is consistent with Roadway's practice of not allowing drivers to work with temporary restrictions.

Plaintiff, therefore, cannot establish that any decision maker at Roadway ever perceived his restrictions regarding his left hand impairment as anything more than temporary and intermittent. Because such temporary restrictions are not protected under the ADA, Roadway could not have perceived or believed that Plaintiff was disabled. *See e.g., Gonzalez v. Perfect Carton Corp.*, No. 95 C 5476, 1996 WL 89058, at *2-3 (N.D. Ill. Feb. 28, 1996); *Vande Zande*, 44 F.3d at 544.

Therefore, based on all of the foregoing, Plaintiff has failed to establish the first element of his *prima facie* case of disability discrimination; namely, that he was disabled. Consequently, because he cannot demonstrate that he was disabled during the relevant time period, the Court finds that when viewing the evidence in the light most favorable to Plaintiff, a genuine issue of material fact does not exist with respect to the issue of disability and a fair-minded jury could not return a verdict for him on the evidence presented in this case.[27]

## III.    REHABILITATION ACT CLAIM (COUNT II)

Plaintiff finally alleges that Roadway discriminated against Plaintiff in violation of Section 504 of the Rehabilitation Act of 1973. (29 U.S.C. § 794; 2nd Am. Compl. ¶¶ 35-38; Pl.'s 2nd Am. Resp. at 27.) Specifically, Plaintiff asserts that because he has set forth a *prima facie* case of disability discrimination under the ADA, his Rehabilitation Act claim should likewise prevail. (Pl.'s 2nd Am. Resp. at 27.)

In order to bring a claim under the Rehabilitation Act, a plaintiff must establish "that he suffers from a disability as defined under the Act; that he was otherwise qualified for the job; that he was involved in programs receiving federal financial assistance; and that he was 'excluded from participation, denied benefits, or otherwise discriminated against solely because of' his disability." *Silk v. City of Chicago*, 194 F.3d 788, 798 n.6 (7th Cir. 1999)(*citing Rothman v. Emory Univ.*, 123 F.3d 446, 452 (7th Cir. 1997)). The *Silk* court noted that the ADA and the Rehabilitation Act are nearly identical and, therefore, it utilized the standards applied under the ADA for the plaintiff's

---

[27]The Court does not need to address the remaining elements of Plaintiff's *prima facie* case because he has failed to adduce sufficient evidence to demonstrated that he is disabled under the ADA.

Rehabilitation Act claim in order to determine if there had been a violation under either statute. *See id.* at 798 n.6 & n.7. The court found that "[t]he Rehabilitation Act provides that the ADA standards are to be applied to determine whether the Rehabilitation Act has been violated." *See id.* at 798 n.7.

The Court, therefore, finds that because Plaintiff cannot show that a genuine issue of material fact exists as to his ADA claim, he also cannot do so for his Rehabilitation Act claim. Consequently, this claim also fails.

### CONCLUSION[28]

Based on the foregoing, Defendant's Motion for Summary Judgment is granted, Plaintiff's Counter Motion for Summary Judgment is denied, and the cause is dismissed with prejudice.[29]

**ENTER:**

*Ian H. Levin*

**IAN H. LEVIN**
**United States Magistrate Judge**

**Dated: October 8, 2002**

---

[28]In view of the Court's ruling herein, it is deemed unnecessary to consider Plaintiff's and Defendant's other arguments raised herein.

[29]Plaintiff's Motion to Strike Dr. Fernandez's June 28, 1999 report and note, or in the alternative to file an affidavit is denied in part and granted in part.